# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA
# DURHAM DIVISION

| | |
|---|---|
| LUCIA BINOTTI, individually and on behalf of all others similarly situated,<br><br>        Plaintiff<br><br>    v.<br><br>DUKE UNIVERSITY<br><br>        Defendant. | Case No. 1:20-cv-470<br><br><br>**COMPLAINT - CLASS ACTION**<br>**DEMAND FOR JURY TRIAL** |

1858644.4

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| I. | SUMMARY OF THE ACTION | 1 |
| II. | JURISDICTION AND VENUE | 2 |
| III. | THE PARTIES | 3 |
| | A. Plaintiff | 3 |
| | B. Defendant | 3 |
| | C. Unnamed Co-Conspirators | 3 |
| IV. | CLASS ACTION ALLEGATIONS | 3 |
| V. | FACTUAL ALLEGATIONS | 5 |
| | A. Trade and Commerce | 5 |
| | B. Competition For Academic Faculty Between Duke and UNC | 5 |
| | C. Duke And UNC Had A Decades-Long Understanding Not To Compete For Each Other's Faculty | 9 |
| | D. Duke and UNC Concealed The No-Poach Understanding From the Class, Including Plaintiff | 10 |
| FIRST CLAIM FOR RELIEF | | 11 |
| SECOND CLAIM FOR RELIEF | | 13 |
| PRAYER FOR RELIEF | | 14 |
| JURY DEMAND | | 15 |

Lucia Binotti, individually and on behalf of a class of similarly situated individuals, hereby states and alleges the following against Defendant Duke University ("Duke").

## I. SUMMARY OF THE ACTION

1. This class action challenges an illegal understanding between Duke and the University of North Carolina, Chapel Hill ("UNC"), to suppress competition for each other's faculty (the "No-Poach Understanding"). The No-Poach Understanding covered all faculty across the two universities. Duke and UNC first reached this understanding long ago, no later than 1974. Senior administrators of both institutions periodically reaffirmed and policed the understanding throughout the subsequent decades. The express purpose of the No-Poach Understanding was to suppress the pay of Duke and UNC faculty.

2. The No-Poach Understanding continued until no later than February 5, 2018, the effective date of the settlement reached between a class of medical faculty and UNC, the University of North Carolina School of Medicine, the University of North Carolina Health Care System, and Dr. William L. Roper in *Seaman v. Duke University, et al.*, 15-CV-462-CCE-JLW (M.D.N.C.) ("*Seaman*"). In that settlement, UNC agreed to a Consent Decree prohibiting UNC from participating in the No-Poach Understanding or anything like it, and requiring UNC to implement a variety of safeguards to ensure that UNC complied. That Consent Decree was buttressed by a second settlement between the medical faculty class and Duke and Duke University Health System, whereby Duke also agreed not to participate in the No-Poach Understanding or anything like it, and to undertake similar steps to ensure compliance. The Duke settlement also included a robust role for the United States Department of Justice to ensure that the No-Poach Understanding ended and would not be reinstated.

3. The Duke *Seaman* settlement released claims of faculty with an academic appointment at the Duke or UNC Schools of Medicine, who were employed by either institution from January 1, 2012 through June 4, 2019. Neither the Duke nor UNC *Seaman* settlements released the claims of the alleged class in this action against Duke. The purpose of this action is to seek damages on behalf of injured Duke and UNC faculty who are not members of the *Seaman* settlement class.

4. The purpose of the *Seaman* litigation was to pursue claims of a class of medical faculty. In the course of that case, evidence of a much broader understanding between Duke and UNC came to light, and was made public for the first time on August 25, 2017, when filings related to class certification were added to the public docket. Prior to that date, members of the class alleged here had no reason to know that the No-Poach Understanding extended beyond the two medical schools. Further, as alleged in more detail below, Duke and UNC took affirmative steps to conceal their misconduct from the class.

5. The No-Poach Understanding restrained trade and was *per se* unlawful under federal and North Carolina law. Plaintiff seeks damages for violations of: Section 1 of the Sherman Act, 15 U.S.C. § 1, and North Carolina General Statutes §§ 75-1 and 75-2.

## II. JURISDICTION AND VENUE

6. Plaintiff brings this action to recover treble damages, costs of suit, and reasonable attorneys' fees, arising from Duke's violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and North Carolina General Statutes §§ 75-1 and 75-2.

7. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331, 1337, and 1367.

8. Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial

part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and Duke resides in this District.

## III. THE PARTIES

### A. Plaintiff

9. Plaintiff Lucia Binotti is a citizen and resident of the State of North Carolina. Professor Binotti has been a Professor of Spanish at the University of North Carolina, Chapel Hill since 1990 in UNC's Department of Romance Studies. Professor Binotti was injured in her business or property by reason of the violation alleged herein.

### B. Defendant

10. Defendant Duke University is a private, tax-exempt, non-profit university with its principal place of business in Durham, North Carolina, that owns and operates educational and research facilities.

### C. Unnamed Co-Conspirators

11. UNC is a public university incorporated under North Carolina law and a constituent institution of the University of North Carolina System, which was created pursuant to statute by the North Carolina General Assembly. *See generally* N.C. Gen. Stat. § 116-1, *et seq.* UNC has its principal place of business in Chapel Hill, Orange County, North Carolina.

## IV. CLASS ACTION ALLEGATIONS

12. Plaintiff brings this action on behalf of herself and all others similarly situated (the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Proposed Class is defined as follows:

> All natural persons employed by Duke University or the University of North Carolina, Chapel Hill from the start of the No-Poach Understanding (to be determined from further discovery) through February 5, 2018, as a faculty member. Excluded from the Class are: members of the boards of directors and boards of trustees, boards of governors, and

senior administrators of Duke and UNC; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

13. Plaintiff does not, as yet, know the exact size of the Proposed Class because such information is in the exclusive control of Duke and UNC. Based upon publically available information, there are at least thousands of Class members. Joinder of all members of the Class, therefore, is not practicable.

14. The questions of law or fact common to the Class include but are not limited to:

    a. whether Duke and UNC had a No-Poach Understanding between approximately 2001 and February 5, 2018;

    b. whether Duke and UNC concealed the existence of the No-Poach Understanding from members of the Proposed Class;

    c. whether Duke's conduct violated the Sherman Act;

    d. whether the No-Poach Understanding is a *per se* violation of the Sherman Act;

    e. whether Duke violated N.C. Gen. Stat. §§ 75-1 and 75-2;

    f. whether the No-Poach Understanding is a *per se* violation of N.C. Gen. Stat. §§ 75-1 and 75-2;

    g. whether the No-Poach Understanding restrained trade, commerce, or competition for faculty between Duke and UNC;

    h. whether Plaintiff and the Proposed Class have suffered antitrust injury; and

    i. the difference between the total compensation Plaintiff and the Proposed Class received from Duke and UNC, and the total compensation Plaintiff and the Proposed Class would have received from Duke and UNC in the absence of the No-Poach Understanding.

1858644.4

15. These and other questions of law and fact are common to the Proposed Class, and predominate over any questions affecting only individual members of the Proposed Class.

16. Plaintiff's claims are typical of the claims of the Proposed Class.

17. Plaintiff will fairly and adequately represent the interests of the Proposed Class and has no conflict with the interests of the Proposed Class.

18. Plaintiff has retained counsel experienced in antitrust and class action litigation to represent herself and the Proposed Class.

19. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual members of the Proposed Class would create the risk of inconsistent or varying adjudications, and be inefficient and burdensome to the parties and the Court.

## V. FACTUAL ALLEGATIONS

### A. Trade and Commerce

20. During the Class Period, Duke and UNC employed members of the Proposed Class in North Carolina, including in this judicial district.

21. The No-Poach Understanding has substantially affected interstate commerce throughout North Carolina and the United States, and has caused antitrust injury throughout North Carolina and the United States.

### B. Competition For Academic Faculty Between Duke and UNC

22. Duke and UNC are the leading employers of academic faculty in North Carolina. No other employer of academic faculty in North Carolina offers the prestige, research support, or quality of academic culture that Duke and UNC provide.

23. In a properly functioning and lawfully competitive labor market, Duke and UNC would compete for faculty members by recruiting and hiring from each other, particularly because Duke and UNC are only about 14 miles apart, well-within commuting distance. The consequence of this proximity on competition for faculty is profound. Any other potential employer with similar prestige, research support, and quality of academic culture would require a faculty member to move to a distant city. This involves significant costs, such as uprooting a family, finding new schools for children, finding new places of worship, and finding alternative employment for a spouse. None of these costs would occur if a faculty member switched between Duke and UNC. As a result, but for the No-Poach Understanding, Duke and UNC would have been very important competitors for faculty, and their competition would have driven up faculty pay.

24. Duke and UNC hired junior faculty immediately after the new hires received their relevant graduate degrees, but these hires require training, and have no track record as a faculty member from which Duke and UNC could accurately and confidently predict job performance. Such junior hires also require supervision, particularly as they seek to attain tenure. Further, tenure reviews themselves are labor-intensive and costly for the hiring institution to conduct. Hiring experienced faculty, by contrast, results in a faculty member with a proven track record of success. Faculty hired directly into a tenured position require far less supervision and training than junior faculty hired directly from their graduate program. But for the No-Poach Understanding, therefore, Duke and UNC would have recruited and hired experienced faculty from each other.

25. Competition for faculty via recruiting and lateral hiring has a significant impact on faculty compensation in a variety of ways. First, when faculty employers become aware of attractive outside opportunities for their faculty, the threat of losing

- 6 -

1858644.4

Case 1:20-cv-00470-CCE-JLW  Document 1  Filed 05/27/20  Page 8 of 18

faculty to competitors encourages employers to preemptively increase compensation to increase morale and competitive positioning, and ultimately to retain valuable faculty. If faculty employers do not react to competition, their faculty may seek positions that offer more generous compensation and benefits elsewhere, or may be receptive to recruiting by a rival employer. Once a faculty member has received an offer from a rival, retaining the faculty member may require a disruptive increase in compensation for one individual, if retention is possible at all. Faculty employers therefore have an incentive to preempt lateral departures by paying all faculty well enough that they are unlikely to seek or pursue outside opportunities. Preemptive retention measures thus lead to increased compensation for all faculty.

26. Second, the availability of desirable positions at competing employers forces employers to reactively increase compensation to retain faculty who are likely to join a competitor institution. This can occur both when a particular faculty member or group of faculty become interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its faculty by increasing compensation levels. In the former case, even a targeted increase designed to retain specific faculty members will put upward pressure on the entire faculty compensation structure.

27. The positive compensation effects of hiring faculty from competitors are not limited to the particular individuals who seek new employment, or to the particular individuals who would have pursued new positions but for the No-Poach Understanding. Instead, the effects of recruiting and hiring from competitors (and the effects of suppressing recruiting and hiring, pursuant to agreement) commonly impact all faculty of the participating institutions.

28. Duke and UNC carefully monitored and managed their internal compensation levels to achieve certain goals, including:

a. maximize both internal and external equity;

b. maintain approximate compensation parity among faculty within the same department and seniority categories (for example, among Assistant Professors in the English Department);

c. maintain certain compensation relationships among faculty across different categories (for example, among Assistant Professors relative to Associate Professors, or between the Biology and Chemistry Departments);

d. avoid discrimination on the basis of race and gender;

e. maintain high faculty morale and productivity;

f. retain faculty; and

g. attract new and talented faculty.

29. To accomplish these objectives, Duke and UNC set compensation levels for different faculty categories that apply to all faculty within those categories. Duke and UNC also compared compensation levels across different faculty categories to ensure equity as between categories. Duke and UNC also analyze and update their faculty compensation structures annually, in a process that involves the very senior administrators who entered into, implemented, and enforced the No-Poach Understanding.

30. While Duke and UNC sometimes engaged in negotiations regarding compensation levels with individual faculty members, these negotiations occurred from a starting point of the pre-existing and pre-determined compensation level. The eventual compensation any particular faculty receives is either entirely determined by the preset level, or is profoundly influenced by it.

31. Thus, if operating under competitive and lawful conditions, Duke and UNC would have recruited and hired faculty from each other, driving faculty pay up. Duke

and UNC both understood this at the time, and avoided paying their faculty more by entering into the No-Poach Understanding.

### C. Duke And UNC Had A Decades-Long Understanding Not To Compete For Each Other's Faculty

32. Duke senior administrators discussed the No-Poach Understanding at a Dean's Cabinet meeting on October 1, 2001. Attendees included Kate Bartlett (then Dean of Duke Law School), Doug Breeden (then Dean of Duke School of Business), Bill Chafe (then Dean of the Duke Faculty of Arts and Sciences and Vice-Provost for Undergraduate Education), Rob Clark (then Dean of the Duke School of Engineering), Greg Jones (then Dean of the Duke Divinity School), Nannerl Keohane (then President of Duke), Peter Lange (then Duke Provost), Bill Schlesinger (then Dean of the Duke School of the Environment), Lew Siegel (then Dean of the Duke Graduate School), and Tallman Trask (then Duke's Executive Vice President and Treasurer). The first item of business at the meeting was to discuss "Agreements Between Duke/UNC Regarding Recruiting", and the minutes confirm: "There has been a casual understanding between Duke and UNC that no recruiting would take place between the two institutions." The minutes further explain: "It is mutually advantageous to both schools to adhere to this practice."

33. The No-Poach Understanding continued well past 2001, and was enforced by many of the same senior administrators who attended the October 1, 2001 Dean's Cabinet meeting. For example, in 2011, Duke's Lange discussed the matter in-person with UNC's Chancellor, Holden Thorpe. Thorpe testified that Lange told him: "we [UNC] should not be trying to move Duke faculty to UNC because if we did, Duke had a lot more money than we did and we were going to come out on the losing end of that deal." Internal UNC emails exchanged with Thorpe thereafter referenced the No-Poach Understanding.

34. The express purpose of the No-Poach Understanding was to suppress pay of the alleged class as a whole, not simply to restrict the mobility of individual faculty

- 9 -

1858644.4

Case 1:20-cv-00470-CCE-JLW   Document 1   Filed 05/27/20   Page 11 of 18

members. For example, in 1995, Thomas Keller, who was then Dean of Duke School of Business, wrote Keohane to complain that his counterpart at UNC was recruiting Duke faculty in violation of the No-Poach Understanding. Keller explained that, while Duke "could certainly make a decision that we want to keep a person and raise their salary, . . . this creates an internal inequity and is difficult in this environment when we have fairly low raises overall. This type of situation is likely to lead to bad internal attitudes." Keller's solution was not to compete against UNC and raise faculty pay. Instead, he asked Keohane to get the UNC Chancellor to "abide by our inter-institutional agreements of not aggressively seeking faculty and staff from the other institution which basically has the end result of increasing salaries at both institutions with no net increase in the quality of the faculty/staff and/or the productivity of the faculty/staff."

35. At the time, Keller also confirmed to Keohane that the No-Poach Understanding had been in place for decades. He wrote to her: "I can say that I have been informed, ever since I've been the Dean, we have an agreement with UNC that we will not aggressively seek faculty or staff between our institutions." Keller had been the Dean of Duke School of Business since 1974.

### D. Duke and UNC Concealed The No-Poach Understanding From the Class, Including Plaintiff

36. Duke and UNC actively concealed their No-Poach Understanding from the Proposed Class, including Plaintiff. For example, it was the practice of both entities not to disclose the existence of the No-Poach Understanding to their faculty or to the public. Yet, behind the scenes, when faculty from one school attempted to apply to the other, administrators at both institutions often engaged in secret back-channel communications concerning the applicant as a means of enforcing and abiding by the No-Poach Understanding—without the applicant's knowledge. Further, Duke and UNC affirmatively avoided memorializing the No-Poach Understanding in a written agreement despite its multi-decade duration, opting instead to train new administrators about the

agreement's existence on a primarily verbal basis. The reason for this practice was to avoid alerting the Proposed Class of the No-Poach Understanding's existence and, thus, to deter potential litigation. The minutes of the 2001 Dean's Cabinet Meeting regarding the No-Poach Understanding, for example, state that "[t]he President would like to see this policy in writing as a goodwill policy and will consult with the Counsel's Office to see if this is an appropriate action." Yet the policy was never formalized in writing—perhaps at the advice of counsel.

37. But for discovery made public from the *Seaman* case, Plaintiff would have remained unaware that the No-Poach Understanding occurred. Because of the secrecy of the No-Poach Understanding and Duke and UNC's acts of concealment, Plaintiff and the proposed Class did not and could not have known that UNC and Duke were engaged in an illegal conspiracy to suppress faculty wages by restraining recruitment and hiring of one another's faculty prior to August 25, 2017. Further, the secrecy of the No-Poach Understanding and Defendants' acts of concealment would have thwarted any reasonable effort to discover the No-Poach Understanding prior to August 25, 2017.

**FIRST CLAIM FOR RELIEF**
(*Violation of the Sherman Act, § 1*)

38. Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Duke as follows.

39. Duke and UNC entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Beginning no later than 2001 and continuing until approximately February 5, 2018, Duke and UNC engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act.

40. Duke and UNC's agreements have included concerted action and undertakings among them with the purpose and effect of: (a) fixing the compensation of

- 11 -

1858644.4

Case 1:20-cv-00470-CCE-JLW   Document 1   Filed 05/27/20   Page 13 of 18

Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition between Duke and UNC for faculty.

41. As a direct and proximate result of Duke and UNC's No-Poach Understanding, members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

42. The unlawful No-Poach Understanding had the following effects, among others:

    a. competition between Duke and UNC for faculty was suppressed, restrained, or eliminated; and

    b. Plaintiff and members of the Proposed Class have received lower compensation from Duke and UNC than they otherwise would have received in the absence of the No-Poach Understanding, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

43. The acts done by Duke and UNC as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective administrators while actively engaged in the management of Duke and UNC's affairs.

44. The No-Poach Understanding is a *per se* violation of Section 1 of the Sherman Act.

45. Accordingly, Plaintiff and members of the Proposed Class seek three times their damages caused by Duke and UNC's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a declaration that such agreement is unlawful.

## SECOND CLAIM FOR RELIEF
*(Violation of N.C. Gen. Stat. §§ 75-1 & 75-2)*

46. Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendant Duke as follows.

47. Duke and UNC entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.

48. Duke and UNC's agreements have included concerted action and undertakings among them with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition between Duke and UNC for faculty.

49. As a direct and proximate result of Duke and UNC's No-Poach Understanding, members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

50. The unlawful No-Poach Understanding had the following effects, among others:

　　a.　competition between Duke and UNC for faculty was suppressed, restrained, or eliminated; and

　　b.　Plaintiff and members of the Proposed Class have received lower compensation from Duke and UNC than they otherwise would have received in the absence of the No-Poach Understanding, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

51. The acts done by Duke and UNC as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective administrators while actively engaged in the management of Duke and UNC's affairs.

- 13 -

1858644.4

52. The No-Poach Understanding is a *per se* violations of N.C. Gen. Stat. §§ 75-1 and 75-2.

53. Accordingly, Plaintiff and members of the Class seek three times their damages caused by Duke and UNC's violations of N.C. Gen. Stat. §§ 75-1 and 75-2, the costs of bringing suit, reasonable attorneys' fees, and a declaration that such agreement is unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment on her behalf and that of the Proposed Class by adjudging and decreeing that:

A. This action may be maintained as a class action, with Plaintiff as the designated Class representative and their counsel as Class counsel;

B. Duke engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act and N.C. Gen. Stat. §§ 75-1 and 75-2, and that Plaintiff and the members of the Proposed Class have been damaged and injured in their business and property as a result of this violation;

C. The alleged combinations and conspiracy be adjudged and decreed to be *per se* violations of the Sherman Act and N.C. Gen. Stat. §§ 75-1 and 75-2;

D. Plaintiff and the members of the Proposed Class she represents recover threefold the damages determined to have been sustained by them as a result of the conduct of Duke and UNC complained of herein, and that judgment be entered against Duke for the amount so determined;

E. Judgment be entered against Duke in favor of Plaintiff and each member of the Proposed Class she represents, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees;

F. For prejudgment and post-judgment interest;

H. For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

I. For attorneys' fees;

J. For costs of suit; and

K. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

Dated:  May 27, 2020					Respectfully submitted,

*/s/ Dean M. Harvey*

Dean M. Harvey (*pro hac vice* forthcoming)
Anne B. Shaver (*pro hac vice* forthcoming)
Lin Y. Chan (*pro hac vice* forthcoming)
Yaman Salahi  (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
dharvey@lchb.com
ashaver@lchb.com
lchan@lchb.com
ysalahi@lchb.com


*/s/ M. Travis Payne*

M. Travis Payne
N.C. State Bar No. 8452
EDELSTEIN & PAYNE
315 East Jones Street
Raleigh, NC 27601
Telephone: (919) 828-1456
Facsimile: (919) 828-4689
eandp@mindspring.com

Robert M. Elliot
N.C. State Bar No. 7709
Daniel Lyon
N.C. State Bar No. 43828
ELLIOT MORGAN PARSONAGE, PLLC
426 Old Salem Rd.
Brickenstein-Leinbach House
Winston-Salem, NC 27101
Telephone: (336) 724-2828
Facsimile: (336) 724-3335
rmelliot@emplawfirm.com


*Counsel for Individual and Representative Plaintiff Lucia Binotti*

- 16 -

1858644.4

Case 1:20-cv-00470-CCE-JLW   Document 1   Filed 05/27/20   Page 18 of 18