# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF NORTH CAROLINA

# DURHAM DIVISION

| | |
|---|---|
| LUCIA BINOTTI, individually and on behalf of all others similarly situated,<br><br>          Plaintiff.<br><br>      v.<br><br>DUKE UNIVERSITY,<br><br>          Defendant. | Case No. 1:20-cv-00470<br><br>**BRIEF IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR ATTORNEY'S FEES, COSTS, AND SERVICE AWARD**<br><br><br>Fed. R. Civ. P. 23 |

# TABLE OF CONTENTS

                                                                    **Page**

I.     INTRODUCTION ................................................................. 1
II.    BACKGROUND ................................................................. 2
       A.   Class Counsel Prosecuted Two Related Cases Regarding the Same
            Alleged Conspiracy on Behalf of the Class. ............................ 2
       B.   The Settlement Depended Upon Class Counsel's Prior Efforts in
            *Seaman*. ................................................................. 4
       C.   This Case Would Not Exist Without Dr. Binotti ........................ 6
III.   LEGAL STANDARD ............................................................. 7
       A.   Attorney's Fees ........................................................... 7
       A.   Expenses .................................................................. 9
       B.   Service Awards ........................................................... 10
IV.    ARGUMENT ..................................................................... 10
       A.   Class Counsel's Request That the Court Award 25% of the Common
            Fund as Attorney's Fees is Reasonable. .............................. 10
            1.   Plaintiff's Counsel Obtained Significant Benefits for the
                 Class (*Barber* Factor 8) ...................................... 11
            2.   Class Counsel's Advocacy In Both Cases Secured The
                 Settlement (*Barber* Factors 1, 2, 3, 6, 9, and 10) ............ 12
            3.   Class Counsel Turned Down Other Opportunities to Work on
                 This Case (*Barber* Factor 4) ................................. 14
            4.   The Requested Fees Are Reasonable In Light Of the
                 Customary Fees for Like Work (Barber Factors 5 and 12)......... 14
       B.   The Court Need Not Apply a Lodestar Crosscheck, But If Applied,
            Crosscheck Should Be Applied Across Both the *Seaman* and *Binotti*
            Cases ..................................................................... 15
            1.   Drawbacks of Utilizing the Lodestar Crosscheck ................ 16
            2.   If Applied, a Lodestar Crosscheck Should Use A
                 Consolidated Lodestar Across Both *Seaman* & *Binotti* ......... 18
       B.   Class Counsels' Expenses are Reasonable and Appropriate............. 22
       C.   Dr. Binotti Has Earned, And Public Policy Supports, The Requested
            Service Award ........................................................... 22
V.     CONCLUSION ................................................................... 25

BRIEF ISO PLAINTIFFS' UNOPPOSED MOTION RE
ATTORNEY'S FEES
CASE NO. 1:20-CV-00470

2240357.11

# TABLE OF AUTHORITIES

## CASES

*Barber v. Kimbrell's Inc.*,
   577 F.2d 216 (4th Cir. 1978) ................................................................. 8, 13, 14

*Beck, et al. v. Boeing Co.*,
   Case No. 00-CV-0301-MJP, Dkt. 106 (W.D. Wash Oct. 8, 2004) ........................... 24

*Been v. O.K. Indus., Inc.*,
   No. CIV-02-285-RAW, 2011 WL 4478766 (E.D. Okla. Aug. 16, 2011) ................. 25

*Been v. O.K. Indus., Inc.*,
   2011 WL 4478766 (E.D. Okla. Aug. 16, 2011), *report and
   recommendation adopted*, 2011 WL 4475291 (E.D. Okla. Sep. 26,
   2011) ................................................................................................................. 25

*Berry v. Schulman*,
   807 F.3d 600 (4th Cir. 2015) .............................................................................. 10, 22

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) .................................................................................................. 7

*Boyd v. Coventry Health Care, Inc.*,
   299 F.R.D. 451 (D. Md. 2014) ................................................................................... 8

*Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington
   Tr., N.A.*,
   919 F.3d 763 (4th Cir. 2019) ..................................................................................... 7

*Daly v. Hill*,
   790 F.2d 1071 (4th Cir. 1986) .................................................................................. 15

*Ferris v. Sprint Commc'ns Co. L.P.*,
   Civ. A. No. 5:11-cv-0067-H, 2012 WL 12914716 (E.D.N.C. Dec. 13,
   2012) .......................................................................................................................... 9

*In re Abrams & Abrams, P.A.*,
   605 F.3d 238 (4th Cir. 2010) ................................................................................... 11

*In re Activision Sec. Litig.*,
   723 F. Supp. 1373 (N.D. Cal. 1989) ........................................................................ 17

*In re Apple Iphone/Ipod Warranty Litig.*,
   40 F. Supp. 3d 1176 (N.D. Cal. 2014) ..................................................................... 16

*In re Auto. Parts Antitrust Litig.*,
   No. 12-md-02311, 2020 WL 5653257 (E.D. Mich. Sep. 23, 2020) .......................... 20

*In re Capacitors Antitrust Litig.*,
   No. 3:14-CV-03264-JD, 2018 WL 4790575 (N.D. Cal. Sept. 21, 2018) .................. 20

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) .................................................................... 11

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re Cotton*,
2019 WL 1233740 (W.D.N.C. Mar. 15, 2019) ........................................................ 8

*In re High-Tech Emp. Antitrust Litig.*,
2015 WL 5158730 (N.D. Cal. Sep. 2, 2015) ..................................................... 23, 24

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) ...................................................................... 24

*In re Ins. Brokerage Antitrust Litig.*,
282 F.R.D. 92 (D.N.J. 2012) ............................................................................. 21

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico,
on Apr. 20, 2010*,
No. 2:10-md-02179-CJB-DPC (E.D. La. Feb. 15, 2017) ........................................ 21

*In re Quantum Health Resources, Inc.*,
962 F. Supp. 1254 (C.D. Cal. 1997) ................................................................. 17

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
No. 2:18-mc-00798-JFC (W.D. Pa. May 4, 2020) ................................................ 12

*In re Se. Milk Antitrust Litig.*,
No. 2:07-CV 208, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) ............................ 21

*In re Titanium Dioxide Antitrust Litig.*,
No. 10-CV-00318(RDB), 2013 WL 6577029 (D. Md. Dec. 13, 2013) ................ 11, 24

*In re Vitamins Antitrust Litig.*,
No. MISC. 99-197(TFH), 2001 WL 34312839 (D.D.C. July 16, 2001) ................... 11

*In re: Urethane Antitrust Litig.*, MDL No. 1616, 2016 WL 4060156 (D.
Kan. July 29, 2016) ....................................................................................... 11

*Ingram v. The Coca-Cola Co.*,
200 F.R.D. 685 (N.D. Ga. 2001) ....................................................................... 24

*Ivax Corp. v. Aztec Peroxides, LLC, et al.*,
No. 02-CV-00593 (D.D.C. Aug. 24, 2005) ......................................................... 24

*Jones v. Dominion Resource Servs.*,
601 F.Supp.2d 756 (S.D. W.Va. 2009) ................................................................ 9

*Krakauer v. Dish Network, L.L.C.*,
No. 1:14-CV-333, 2018 WL 6305785 (M.D.N.C. Dec. 3, 2018) ...................... 7, 8, 11

*Lopez v. Youngblood*, No.
CV-F-07-0474 DLB, 2011 WL 10483569 (E.D. Cal. Sept. 2, 2011) ....................... 17

*Loretz v. Regal Stone, Ltd.*,
756 F. Supp. 2d 1203 (N.D. Cal. 2010) ............................................................... 9

*Marchbanks Truck Serv. v. Comdata Network, Inc.*,
No. 07-CV-1078, Dkt. 713 (E.D. Pa. July 14, 2014) ............................................ 24

*Muhammad v. Nat'l City Mortg., Inc.*,
  2008 WL 5377783 (S.D. W.Va. Dec. 19, 2008).........................................................7

*Payne v. Sprint Commc'ns Co. L.P.*,
  Civ. A. No. 1:11-cv-3434-CCB, 2012 WL 13006270 (D. Md. Nov. 30,
  2012) ...............................................................................................................9, 21

*Phillips v. Triad Guar. Inc.*,
  No. 1:-09-cv-71, 2016 WL 2636289 (M.D.N.C. May 9, 2016) .............................7, 21

*Reaching Hearts Int'l, Inc. v. Prince George's Cty.*,
  478 Fed.Appx. 54 (4th Cir. 2012)........................................................................15

*Roberts v. Texaco, Inc.*,
  979 F. Supp. 185 (S.D.N.Y. 1997)........................................................................23

*Seaman v. Duke Univ.*,
  No. 1:15-cv-00462, 2019 WL 4674758 (M.D.N.C. Sept. 25, 2019) ..................passim

*Sims v. BB&T Corp.*,
  2019 WL 1993519 (M.D.N.C. May 6, 2019) ......................................................passim

*Singleton v. Domino's Pizza, LLC*,
  976 F. Supp. 2d 665 (D. Md. 2013).......................................................................22

*Smith v. Krispy Creme Doughnut Corp.*,
  2007 WL 119157 (M.D.N.C. Jan. 10, 2007) .............................................................9

*Strang v. JHM Mortg. Sec. Ltd. P'ship*,
  890 F.Supp. 499 (E.D. Va. 1995) ............................................................................7

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011), *cert. denied,* 132 S. Ct. 1876 (2012)...........................24

*Swedish Hosp. Corp. v. Shalala*,
  1 F.3d 1261 (D.C.Cir.1993) ..................................................................................17

*Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*,
  No. 3:08-CV-00271-JFA, 2012 WL 13008138 (D.S.C. July 31, 2012)..............10, 22

*Velez v. Novartis Pharm. Corp.*,
  No. 04 Civ. 09194(CM), 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ..................24

**RULES**

Fed. R. Civ. P. 23(h)..............................................................................................7, 9

**TREATISES**

4 Rubenstein, Newberg on Class Actions § 15:88 ......................................................15

5 *Newberg on Class Actions* § 17:13 (5th ed. 2019) ....................................................10

Alba Conte, 1 Attorney Fee Awards § 2:19 (3d ed. 2018).............................................10

Manual for Complex Litigation § 14.121 (4th ed. 2018) .................................................7

BRIEF ISO PLAINTIFFS' UNOPPOSED MOTION RE
ATTORNEY'S FEES
CASE NO. 1:20-CV-00470

2240357.11

Case 1:20-cv-00470-CCE-JLW   Document 59-1   Filed 07/12/21   Page 5 of 35

## TABLE OF AUTHORITIES
### (continued)

### OTHER AUTHORITIES

*Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525 (1998) .......................................................... 17

Nantiya Ruan, *Bringing Sense to Incentives: An Examination of Incentive Payments to Named Plaintiffs in Employment Discrimination Class Actions*, 10 Employment Rights & Employment Policy Journal 395, 396-397 (2006) ................................................................................................. 23

*Report of the Third Circuit Task Force, Court Awarded Attorney Fees*, 108 F.R.D. 237 (1985) ................................................................................. 16

*Third Circuit Task Force Report on Selection of Class Counsel*, 208 F.R.D. 340 (2002) ................................................................................... 7

# I.  **INTRODUCTION**

Class Counsel secured a Settlement totaling $19 million for approximately 5,239 regular faculty and 10,550 non-regular faculty at Duke and UNC Chapel Hill.  The Settlement is an excellent result given the early stage of the case and the considerable risks to the Class of continued litigation.  Further, Class Counsel's advocacy in *Seaman v. Duke University*, No. 1:15-cv-00462-CCE-JLW (M.D.N.C.) was critical to this Settlement.  The basis for Dr. Binotti's complaint relied upon discovery from *Seaman*, and Dr. Binotti's experts relied on their work in *Seaman* to estimate damages here, which Class Counsel used to negotiate the Settlement.

Although Courts in this Circuit regularly award one-third of common funds as attorney's fees, here Class Counsel seek a lower percentage: 25%, or $4,750,000.  The percentage approach has become the preferred method for awarding fees in common fund cases because it corrects the deficiencies of the lodestar method: it aligns the interests of counsel with the interests of the class.  Most courts that use the percentage of fund method do not apply a lodestar crosscheck.  Should the Court decide to apply a lodestar crosscheck, it should use a consolidated lodestar across both *Seaman* and *Binotti*.  Class Counsel's work across the two closely-related cases over six years resulted in the Settlement.  This case, and this Settlement, would not have been possible without the *Seaman* litigation.

Class Counsel also request a service award of $65,000 for Dr. Binotti to compensate her for making this result possible.  Dr. Binotti put herself at risk of

retaliation by implicating her employer in this suit, and her name will forever be associated with the litigation. Further, although the Class includes over 10,000 faculty members, no other faculty stepped forward to risk their personal reputation or jobs for the Class. These factors weigh in favor of granting Dr. Binotti her requested service award.

## II.    BACKGROUND

### A.    Class Counsel Prosecuted Two Related Cases Regarding the Same Alleged Conspiracy on Behalf of the Class.

*Seaman*.  Dr. Seaman filed her first complaint against Duke on June 9, 2015. *Seaman*, Dkt. 1.  She alleged that Duke and UNC agreed to eliminate competition for each other's medical faculty in violation of the antitrust laws.  *Id.*  In 2017, UNC agreed to a consent decree prohibiting it from enforcing the alleged no-poach agreement or entering into anything like it in the future.  *Id.*, Dkt. 83-1 at 59.  This injunctive relief benefited the classes of both *Seaman* and *Binotti*, since it was University-wide.  *Id.*  The UNC settlement also contained discovery cooperation, including document production from many senior administrators *outside of* the UNC medical school.  *Id.* at 65.  Dr. Seaman did not seek money damages from UNC because UNC was protected by sovereign immunity.  *See id.*, Dkt. 82 at 22-23.

Then in 2019, after nearly four years of hard-fought litigation, Dr. Seaman reached a settlement with Duke to resolve the medical faculty class claims.  Duke agreed to pay $54.5 million and agreed to significant injunctive relief.  *Seaman,* No. 1:15-cv-00462-CCE-JLW (M.D.N.C.), Dkt. 361 at 7, 42, 47.  That settlement also set forth an unprecedented role for the United States Department of Justice to monitor and enforce

compliance with the settlement's injunctive relief provisions. *Id*. at 24, 47, 59. Just as with the UNC settlement, the injunctive relief provisions were University-wide, and thus benefited the classes at issue in both *Seaman* and *Binotti*.

When *Seaman* was filed, Dr. Seaman was only aware of the alleged no-poach agreement between the Duke and UNC medical schools. As a result of the extensive discovery efforts undertaken in *Seaman*, Class Counsel discovered that the alleged conspiracy was part of a larger alleged University-wide effort to eliminate competition for all faculty of the two institutions. While *Seaman* resolved the damages claims of medical faculty and provided injunctive relief to the benefit of all faculty, the damages claims of non-medical faculty remained unaddressed.

*Binotti*. To seek damages for non-medical faculty, Dr. Binotti filed her complaint against Duke on May 27, 2020. Dkt. 1. No other plaintiffs, and no other counsel, stepped forward to take on the challenge of pursing damages claims for the remaining faculty. She alleged a University-wide understanding between Duke and UNC to suppress competition for each other's faculty (the "No-Poach Understanding"). *Id*. Before filing that complaint, Dr. Binotti and the undersigned counsel made extensive efforts with Duke over five months to reach a settlement, facilitated by mediator Jonathan Harkavy, the same mediator in *Seaman*. Declaration of Dean M. Harvey ¶ 22. Those negotiations were unsuccessful. *Id*.

On July 27, 2020, Duke answered the complaint and filed a Motion for Judgment on the Pleadings, arguing that (1) Dr. Binotti's claims are barred by the statute of

limitations, and (2) Dr. Binotti failed to make factual allegations sufficient to toll the statute of limitations. Dkts. 16, 17. On November 9, 2020, the Court denied the motion regarding the statute of limitations, finding it was plausible that the alleged multi-decade conspiracy continued beyond 2011 and that Duke continued to commit overt acts within the statute of limitations. *Id*. The Court, however, limited damages claims to those sustained after 2016, concluding that Dr. Binotti had not plausibly alleged an active act of concealment. *Id*.

The parties then made a renewed effort to resolve the matter, involving extensive negotiations that culminated in an arm's length, full-day mediation held on December 16, 2020 with Mr. Harkavy. Harvey Decl. ¶ 23. That mediation resulted in the proposed Settlement, which the Court preliminarily approved on April 22, 2021 (Dkt. 55), as amended on June 14, 2021 (Dkt. 58). *Id*.

## B. <u>The Settlement Depended Upon Class Counsel's Prior Efforts in *Seaman*.</u>

The Settlement here is the direct result of not just this case, but the cumulative litigation efforts against Duke for more than six years in two closely-related cases regarding the same alleged course of misconduct. Dr. Binotti would not have been aware that she and other non-medical faculty had a claim without Class Counsel's work in the *Seaman* case. Declaration of Lucia Binotti ¶ 6. And, in fact, no case was filed regarding these claims until (or after) Class Counsel filed *Binotti*.

*Seaman* was necessary to the discovery of Duke and UNC's alleged No-Poach Understanding. Harvey Decl. ¶ 15. This work was thorough and costly. Duke produced over 91,000 documents exceeding 400,000 pages, and UNC produced over 8,000 documents totaling over 32,000 pages. *Id.* Together, these productions totaled 161 gigabytes. *Id.* That included over 28,957 separate files (12.9 gigabytes in total) related to the conspiracy and employee compensation, and 70 gigabytes related to employee data files. *Id.* Class Counsel was not content with documents limited to the medical schools. *Id.* Critically, Class Counsel successfully pressed for documents from many custodians outside of the medical schools, from both UNC and Duke. *Id.* These documents included the most important evidence relevant to the claims of all faculty, such as the internal correspondence among the leadership of Duke regarding the alleged no-poach understanding with UNC. *Id.*

Class Counsel devoted significant time seeking this discovery, which required filing two motions to compel. Harvey Decl. ¶ 16; *Seaman,* No. 1:15-cv-00462-CCE-JLW (M.D.N.C.), Dkt. Nos. 198, 210. Class Counsel also devoted hundreds of hours analyzing the discovery, including the retention of three experts who authored 12 reports, totaling over 680 pages, and sat for 5 depositions. *Id.* These expert opinions were relevant to both *Seaman* and *Binotti*. *Id.* Further, Class Counsel deposed 15 percipient witnesses, whose testimony was a primary basis for Dr. Seaman's and Dr. Binotti's settlement strategies. *Id.* The expert work conducted in *Seaman* played an important and

2240357.11

necessary role in estimating damages in *Binotti*, and thus in the settlement negotiations. *Id.*

### C. This Case Would Not Exist Without Dr. Binotti

Had Dr. Binotti not retained the same Class Counsel as in *Seaman* to file this class action, there is no reason to suspect that anyone else would have filed a case. By filing this case and diligently performing her duties as Class Representative, Dr. Binotti has performed a valuable public service that will benefit thousands of faculty at Duke and UNC. Since filing, Dr. Binotti has been personally involved in every significant step of this case. Binotti Decl. ¶ 3. On several occasions, she provided Class Counsel with advice regarding litigation strategy and the terms of the settlement with Duke. *Id.* She has spent over 70 hours performing her duties as Class Representative. *Id.* ¶ 8.

Dr. Binotti undertook these efforts for the Class notwithstanding a significant risk and fear of retaliation. Binotti Decl. ¶ 9. Nevertheless, she felt that her rights and those of her fellow Class Members were too important to stay quiet. *Id.* The risks Dr. Binotti faced—and will continue to face—extend beyond UNC and Duke to her overall career and reputation. Binotti Decl. ¶¶ 9-13. By bringing this lawsuit and helping the Class, Dr. Binotti also risks that other universities and employers will not want to hire her because they will view her as a troublemaker. *Id.* ¶ 12. Indeed, this case has garnered publicity in local and national press. [1] In broader professional academic circles, she was

---

[1] *See, e.g.*, Connie Gentry, *An Improper Pact Between UNC, Duke?*, Triangle Bus. J. (July 31, 2020), https://www.bizjournals.com/triangle/news/2020/07/31/duke-unc-class-action-lawsuit-salaries.html; Leah Boyd, *UNC Professor Sues Duke, Alleges Agreement*

BRIEF ISO PLAINTIFFS' UNOPPOSED MOTION RE
ATTORNEY'S FEES
CASE NO. 1:20-CV-00470

2240357.11

warned several times that other universities "will not touch" a faculty member who has filed a lawsuit involving her college. *Id.* Dr. Binotti's name will forever be publicly associated with this case. *Id.* ¶ 13.

## III. LEGAL STANDARD

### A. Attorney's Fees

"[L]awyer[s] who recover[] a common fund . . . [are] entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); Fed. R. Civ. P. 23(h). *See also Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 785 (4th Cir. 2019).

"District courts in the Fourth Circuit 'overwhelmingly' prefer the percentage method in common-fund cases . . . ." *Krakauer v. Dish Network, L.L.C.*, No. 1:14-CV-333, 2018 WL 6305785, at *2 (M.D.N.C. Dec. 3, 2018) (quoting *Phillips v. Triad Guar. Inc.*, No. 1:-09-cv-71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016)); *see also Manual for Complex Litigation* § 14.121 nn. 483-85 (4th ed. 2018) (collecting cases).[2]

---

with UNC to Suppress Competition for Faculty, Duke Chron. (May 28, 2020), https://www.dukechronicle.com/article/2020/05/duke-university-unc-professor-sues-duke-alleges-agreement-suppress-competition-faculty-lawsuit; Daphne Zhang, *Insurer Must Face Duke's Suit Over Antitrust Class Actions*, Law 360 (June 8, 2021), https://www.law360.com/articles/1391964/insurer-must-face-duke-s-suit-over-antitrust-class-actions.

[2] *See also Muhammad v. Nat'l City Mortg., Inc.*, Civ. A. No. 2:07-0423, 2008 WL 5377783, at *8 (S.D. W.Va. Dec. 19, 2008) (recognizing "that the percentage of fund approach is the better-reasoned and more equitable method of determining attorneys' fees" in class action cases resulting in a common fund); *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F.Supp. 499, 503 (E.D. Va. 1995) (percentage method "is more efficient and less burdensome than the traditional lodestar method, and offers a more reasonable measure of compensation for common fund cases"); *Report of the Third Circuit Task Force, Selection of Class Counsel*, 208 F.R.D. 340, 355 (2002) ("A percentage fee, tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel.").

"Contingent fees of one-third are common in this circuit in cases of similar complexity." *Seaman v. Duke Univ.*, No. 1:15-cv-00462, 2019 WL 4674758, at \*3 (M.D.N.C. Sept. 25, 2019)*; Krakauer,* 2018 WL 6305785, at \*3 (same); *see also Sims v. BB&T Corp.*, Nos. 1:15-CV-732, 1:15-CV-841, 2019 WL 1993519, at \*4 (M.D.N.C. May 6, 2019) (Eagles, J.) (awarding one-third of common fund as reasonable attorney's fee); *In re Cotton*, No. 3:18-cv-00499-RJC, 2019 WL 1233740, at \*4 (W.D.N.C. Mar. 15, 2019) (same).

Twelve factors guide the reasonableness of a fee award: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *Sims*, 2019 WL 1993519, at \*1 (quoting *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)).

Additionally, the Court may, but is not required, to "conduct a lodestar cross-check that compares the requested contingent fee award against a fee calculated based on hours spent at prevailing market rates." *Id.* at \*2 (citing *Boyd v. Coventry Health Care, Inc.*, 299 F.R.D. 451, 462 (D. Md. 2014)). When using lodestar method as a "cross-

check," the Court need not apply the "exhaustive scrutiny" typically mandated, and the Court may accept the hours estimates provided by counsel. *Jones v. Dominion Resource Servs.*, 601 F.Supp.2d 756, 765–766 (S.D. W.Va. 2009).

Where a settlement is the result of successive cases (or successive settlements within the same case), the proper method of performing a lodestar cross-check is to divide the total lodestar for the entire litigation campaign by the aggregate fees requested, including fees previously awarded. *See Ferris v. Sprint Commc'ns Co. L.P.*, Civ. A. No. 5:11-cv-0067-H, 2012 WL 12914716, at *3 (E.D.N.C. Dec. 13, 2012) (noting that litigation across the country for more than a decade resulted in settlements of similar cases, which prevent class counsel from "segregating their fees"); *Payne v. Sprint Commc'ns Co. L.P.*, Civ. A. No. 1:11-cv-3434-CCB, 2012 WL 13006270 (D. Md. Nov. 30, 2012) (same); *Loretz v. Regal Stone, Ltd.*, 756 F. Supp. 2d 1203, 1214 (N.D. Cal. 2010) (holding that time from separate, previous cases against the same defendant may count toward class action lodestar where "the work performed advanced [the pending] class action").

A.    **Expenses**

The Court may also award nontaxable costs from the common fund. Fed. R. Civ. P. 23(h). "The prevailing view is that expenses are awarded in addition to the fee percentage." *Sims*, 2019 WL 1993519, at *4 (quoting *Smith v. Krispy Creme Doughnut Corp.*, No. 1:05CV00187, 2007 WL 119157, at *3 (M.D.N.C. Jan. 10, 2007)). "Reimbursable expenses include expert fees, travel, long-distance and conference

BRIEF ISO PLAINTIFFS' UNOPPOSED MOTION RE ATTORNEY'S FEES
CASE NO. 1:20-CV-00470

2240357.11

telephone, postage, delivery services, settlement costs, and computerized legal research." *Id.* (citing, *inter alia*, Alba Conte, 1 *Attorney Fee Awards* § 2:19 (3d ed. 2018)).

## B. Service Awards

Service awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015) (citation omitted). Such awards are "common . . . in recognition of the time and effort [class representatives] have invested for the benefit of the class." *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-CV-00271-JFA, 2012 WL 13008138, at *6 (D.S.C. July 31, 2012). Other factors commonly considered by courts include the class representative's actions to protect the class, the degree to which the class has benefited, the amount of time and effort expended by the class representative, the risk (financial and otherwise) assumed, the notoriety and personal difficulties encountered, the duration of the litigation, the personal benefit (or lack thereof) enjoyed by the class representative from litigation, the ultimate recovery to the class, and the sums awarded in similar cases. *See* William B. Rubinstein et al., 5 *Newberg on Class Actions* § 17:13 (5th ed. 2019).

## IV. ARGUMENT

### A. Class Counsel's Request That the Court Award 25% of the Common Fund as Attorney's Fees is Reasonable.

In the Fourth Circuit, attorney's fees of one-third of the common fund is considered a presumptively reasonable benchmark. *See Seaman*, 2019 WL 4674758, at

*3; *Krakauer,* 2018 WL 6305785, at *3; *Sims,* 2019 WL 1993519, at *4. Here, Class

Counsel seek *less*: 25%. All *Barber* factors favor granting Class Counsel's request.

### 1.    Plaintiff's Counsel Obtained Significant Benefits for the Class (*Barber* Factor 8)

The monetary recovery for the Class is the most significant factor supporting the

requested fee award. This excellent result weighs in favor of the requested award, *In re*

*Abrams & Abrams, P.A.*, 605 F.3d 238, 247 (4th Cir. 2010) (result obtained is "the most

critical factor in determining the reasonableness of a fee award" (citation omitted));

*Seaman*, 2019 WL 4674758, at *3 (Eagles, J.) ("[t]he excellent result obtained" supported

a finding that the requested fee was reasonable); *Krakauer*, 2018 WL 6305785, at *3

(Eagles, J.) (same, where counsel "achieved an excellent result on behalf of the class"

with "an average payout of more than $3,000 per class member"), and is in line with fee

awards granted in similar large, complex antitrust class actions. *See*, *e.g.*, *Seaman*, 2019

WL 4674758, at *4 (one-third of 54.6 million); *In re Titanium Dioxide Antitrust Litig.*,

No. 10-CV-00318(RDB), 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (one-third of

$163.5 million settlement); *In re: Urethane Antitrust Litig.*, MDL No. 1616, 2016 WL

4060156, at *8 (D. Kan. July 29, 2016) (one-third of $835 million settlement); *In re*

*Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1366 (S.D. Fla. 2011) (one-

third of $510 million settlement fund); *In re Vitamins Antitrust Litig.*, No. MISC. 99-

197(TFH), 2001 WL 34312839, at *9 (D.D.C. July 16, 2001) (over one-third of $365

million settlement).

Here, Class Counsel secured a Settlement totaling $19 million for approximately 5,239 for regular rank faculty (i.e., those who worked full-time on tenure track positions) and 10,550 non-regular faculty positions. That is an average per capita net recovery of approximately $2,341.19 for regular rank faculty and $152.54 for non-regular faculty, if the instant request for fees, costs, and service award is granted. Compared to other antitrust cases concerning anticompetitive behavior, the recovery for the regular rank faculty is one of the largest. Harvey Decl. ¶ 20. Only one other case resolved at a similarly early stage in the litigation. There the average net recovery was approximately $3,437 per member of the settlement class. *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, No. 2:18-mc-00798-JFC (W.D. Pa. May 4, 2020), Dkt. 271 at 14. The recovery here is favorable, particularly since the Class in *Binotti* faced significant litigation risks that were not at issue in *Rail*. Harvey Decl. ¶ 21.

## 2. Class Counsel's Advocacy In Both Cases Secured The Settlement (*Barber* Factors 1, 2, 3, 6, 9, and 10)

The Settlement is the result of Class Counsel's skilled advocacy for the Class. Class Counsel navigated several complex questions of law, including whether Dr. Binotti's claims were barred by the statute of limitations, and whether her factual allegations were sufficient to toll the statute of limitations based on fraudulent concealment. These issues were particularly challenging given Dr. Seaman had filed her lawsuit five years prior to Dr. Binotti's complaint, in 2015. Additionally, Class Counsel retained highly qualified economic experts to estimate the extent to which the alleged misconduct suppressed Class pay. Harvey Decl. ¶ 17. These experts relied in substantial

part on the similar work they performed to calculate damages in *Seaman*. *Id.* That estimate was critical to Class Counsel's informed settlement discussions with Duke, which ultimately lead to the Settlement. *Id.* ¶ 13.

Further, Class Counsel's successful litigation of this case was derived in no small part from their repeated victories in the *Seaman* litigation. Dr. Seaman prevailed on the motions to dismiss (Dkt. 39); stopped Defendants' attempted appeal from the Court's denial of those motions (Dkt. 50); obtained substantial discovery from Duke and UNC, requiring motions to compel (Dkts. 198, 210, 270, 298); certified the Class (Dkt. 189); stopped an attempted appeal of the class certification decision (Dkt. 207); settled with UNC, obtaining substantial injunctive relief and discovery relevant to claims against Duke in both *Seaman* and *Binotti* (Dkt.185); briefed and argued eight summary judgment and *Daubert* motions (Dkts. 330, 331, 334, 335); presented to the United States Department of Justice ("DOJ") prior to its statements of interest and compelling oral argument in favor of the Class (Dkt. 325); and prepared for trial, including conducting several jury focus groups, Harvey Decl. ¶ 18. Class Counsel's specialized expertise in the realm of antitrust employment cases generally also helped secured the *Binotti* Settlement, as well as Class Counsel's prior experience with complex class action litigation and antitrust cases, *see* Harvey Decl. ¶ 18. *Cf. Barber*, 577 F.2d at 226 n.28 (court should consider "the skill required to properly perform the legal services rendered," "the novelty and difficulty of the questions raised," and "the experience, reputation and ability of the attorney").

### 3. Class Counsel Turned Down Other Opportunities to Work on This Case (*Barber* Factor 4)

Another important consideration is "the attorney's opportunity costs in pressing the instant litigation." *Barber*, 577 F.2d at 226 n.28. The attorneys and staff on this case have worked over 13,400 hours since its inception, including 12,500 hours in *Seaman*, and 883.2 hours in this case. Harvey Decl. ¶ 8; Declaration of Robert Elliot ¶ 16; Declaration of Travis Payne ¶ 19. To do that, attorneys on this case had to turn down alternative opportunities.

### 4. The Requested Fees Are Reasonable In Light Of the Customary Fees for Like Work (Barber Factors 5 and 12)

Since filing the *Seaman* litigation through the date of this petition, Class Counsel have expended more than 13,400 hours prosecuting the alleged conspiracy, for a total lodestar of approximately $6.8 million. Harvey Decl. ¶ 8; Elliot Decl. ¶ 16; Payne Decl. ¶ 19. The hours expended and the hourly rates are reasonable.

<u>Hours Expended</u>: The number of hours is reasonable in light of the complexity of this case, the vigorous defense, the volume of evidence, and the stage of proceedings reached. The Court previously held that the time spent in *Seaman* was reasonable, *Seaman*, 2019 WL 4674758, at *4, and the additional 883.2 hours spent in *Binotti* were efficient and necessary to obtain the settlement here.

Class Counsel provide herewith a summary of the time performed by each person who has worked on this case since it was filed. Harvey Decl., Ex. B; Payne Decl. ¶ 19, Elliot Decl. ¶ 16. Class Counsel expended time and expenses efficiently; for example,

Class Counsel often had one associate or junior partner draft the first versions of all of its filings as well as communicate with co-counsel and opposing counsel, with final approval by senior partners.  Harvey Decl. ¶ 2.  Further, Class Counsel will expend additional time after this motion to oversee the notice program, respond to Class Member inquiries, prepare and file a motion for final approval of the settlement, and oversee settlement distribution to Class Members (this may involve hundreds of additional hours).  Harvey Decl. ¶ 9.

Hourly Rates:  The rates are also reasonable.  For purposes of the lodestar, Class Counsel have billed attorneys at current market rates.  Harvey Decl. ¶ 10.  The use of current rather than historical rates is appropriate to account for the delay in payment.  *See Daly v. Hill*, 790 F.2d 1071, 1081 (4th Cir. 1986); *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 478 Fed.Appx. 54, 60 (4th Cir. 2012).  These rates are in line with the national market rate for attorneys in complex antitrust litigation.  *See Sims*, 2019 WL 1993519, at *2 (noting that "a national market rate is appropriate for matters involving complex issues requiring specialized expertise" and approving hourly rates from $650-$1,060 for attorneys with over 5 years' experience).  Additionally, other courts have approved these rates for Class Counsel's attorneys.  *See* Harvey Decl. ¶ 10 (citing cases).

**B.     The Court Need Not Apply a Lodestar Crosscheck, But If Applied, Crosscheck Should Be Applied Across Both the *Seaman* and *Binotti* Cases**

The Court is not required to conduct a lodestar crosscheck.  *See* 4 Rubenstein, Newberg on Class Actions § 15:88.  On this issue, Plaintiffs submit the Declaration of

Brian T. Fitzpatrick, a Professor of Law at Vanderbilt University. Fitzpatrick Decl. ¶ 1.

Professor Fitzpatrick authored the most comprehensive study of federal class action

settlements and attorneys' fees that has ever been published. *Id*. ¶ 3. The study included

the examination of *every* class action settlement approved by a federal court over a two-

year period, or 688 settlements. *Id*. Professor Fitzpatrick found that most courts that use

the percentage method do not use the lodestar crosscheck. *Id*. ¶ 16. Instead, the

percentage of fund approach is considered the superior method of awarding fees in

complex class actions cases such as this one. *Id*. ¶ 12. The very good reasons why a

lodestar crosscheck is discouraged apply fully here.

### 1. <u>Drawbacks of Utilizing the Lodestar Crosscheck</u>

At one time, courts awarded fees in common fund class action cases using the

"lodestar" approach. However, that approach is now disfavored. Fitzpatrick Decl. ¶ 11.

Indeed, "[w]hatever merits the lodestar method might have, [] it has also been subject to

heavy criticism by commentators and in the courts." *In re Apple Iphone/Ipod Warranty

Litig.*, 40 F. Supp. 3d 1176, 1180 (N.D. Cal. 2014). *See also Manual for Complex

Litigation*, *supra*, § 14.121 ("In practice, the lodestar method is difficult to apply, time

consuming to administer, inconsistent in result, . . . capable of manipulation, . . . [and]

creates inherent incentive to prolong the litigation . . . ."); *Report of the Third Circuit

Task Force*, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 255 (1985) (enumerating

nine deficiencies in the lodestar process and concluding that in common fund cases the

best determinant of the reasonable value of services rendered to the class by counsel is a percentage of the fund).

"Among the drawbacks to the lodestar method . . . are that the lodestar method increases the amount of fee litigation; the lodestar method lacks objectivity; the lodestar method can result in churning, padding of hours, and inefficient use of resources; when the lodestar method is used, class counsel may be less willing to take an early settlement since settlement reduces the amount of time available for the attorneys to record hours; and the lodestar method inadequately responds to the problem of risk." *Lopez v. Youngblood*, No. CV-F-07-0474 DLB, 2011 WL 10483569, at *4 (E.D. Cal. Sept. 2, 2011).[3]

Many courts have abandoned the lodestar method for two reasons. First, in complex class action cases the lodestar is difficult to calculate; courts had to spend an unreasonable about of time reviewing voluminous time records. Fitzpatrick Decl. ¶ 14.

---

[3] *See also* Reagan Silber & Frank E. Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525, 534 (1998) (the percentage of the fund approach avoids numerous drawbacks of the lodestar approach and is preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class. Hence, under the percentage approach, the class members and the class counsel have the same interest-maximizing the recovery of the class"); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989) ("[A]pplying the lodestar or Kerr–Johnson regime to common fund cases does not achieve the stated purposes of proportionality, predictability and protection of the class. It encourages abuses such as unjustified work and protracting the litigation. It adds to the work load of already overworked district courts. In short, it does not encourage efficiency, but rather, it adds inefficiency to the process."); *In re Quantum Health Res., Inc.*, 962 F. Supp. 1254, 1256-57 (C.D. Cal. 1997) ("Courts and commentators have been wary of the lodestar method since its introduction . . . . [T]he lodestar method needlessly increases judicial workload, creates disincentive for early settlement, and causes unpredictable results."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268 (D.C. Cir. 1993) ("[U]sing the lodestar approach in common fund cases encourages significant elements of inefficiency [as] attorneys are given incentive to spend as many hours as possible, billable to a firm's most expensive attorneys.").

Second—and more importantly—courts moved away from the lodestar method because the interests of the class were not aligned with the interests of class counsel; class counsel's recovery did not depend on how much the class recovered, but, rather, on how many hours could be spent on the case. *Id.* ¶ 15. The lodestar method is now used to award fees in only a small percentage of class action cases, usually those involving fee-shifting statutes or those where the relief is predominantly injunctive in nature (and the value of the injunction cannot be reliably calculated), neither of which is applicable or appropriate here. *Id.* ¶ 11.

The more common method of calculating attorneys' fees today is the "percentage" method. Fitzpatrick Decl. ¶ 12. It corrects the deficiencies of the lodestar method: it is less cumbersome to calculate, and it aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers. *Id.* Thus, in order to properly compensate Class Counsel for their successful efforts on behalf of the Class, the Court should find the request for attorneys' fees in the amount of 25% of the fund is reasonable for the reasons articulated in Section IV(A) above (analyzing the *Barber* factors).

2. **If Applied, a Lodestar Crosscheck Should Use A Consolidated Lodestar Across Both *Seaman* & *Binotti***

Should the Court decide to implement a lodestar crosscheck, it should use a consolidated lodestar across both *Seaman* and *Binotti*. In other words, the Court should

BRIEF ISO PLAINTIFFS' UNOPPOSED MOTION RE ATTORNEY'S FEES CASE NO. 1:20-CV-00470

aggregate all of the time and all of the fee awards in *Seaman* and *Binotti* as if Class Counsel's fee request came at the end of both *Seaman* and *Binotti*.

Professor Fitzpatrick illustrates how the consolidated lodestar approach is superior to the piecemeal approach through a helpful example: suppose Class Counsel brought two lawsuits. One case settled for $30 million in five years, and the second settled for $30 million in six years. Fitzpatrick Decl. ¶ 21. During this time, Class Counsel accrued $2 million in lodestar each year. *Id.* Class Counsel then moved for attorney's fees, seeking 1/3 of the fees of **both** cases (aka the consolidated approach). *Id.* The court would take the fee request (1/3 of a total $60 million, or $20 million) divided by the accrued lodestar (6 years x 2 million/year = 12 million) which would result in a multiplier of 1.66. *Id.*

The piecemeal approach leads to a very different outcome. While the first request (1/3 of 30 million or 10 million) would come after Class Counsel had already accrued $10 million in lodestar and expenses ($2 million x 5 years) and result in multiplier of 1, a big problem arises with the second fee request. *Id.* Class Counsel would seek the second fee request (1/3 of $30 million or $10 million) just one year later, after Class Counsel accrued only $2 million in lodestar and expenses and thus result in a much large 5x multiplier. *Id.* Some courts might consider this request too high and cut the second fee award. *Id.* Class Counsel would therefore end up with different fees in the same litigation with the same outcome based on nothing but when the fee requests were made. *Id.*

The aggregate approach of consolidating the efforts in *Seaman* and *Binotti* is preferable to a piecemeal approach for two important reasons. First, it prevents arbitrary differences in the fee awards. *Id.* ¶ 23. *Seaman* and this case are essentially the same litigation, a challenge to the legality of the same alleged No-Poach Agreement between Duke and UNC. The timing of the fee requests and the organization of the effort into two separate cases should not affect the amount of fees. *Id.*

Second, waiting until the very end of all litigation to seek any fees imposes enormous cost on class counsel, and as a result, the class members they represent. Unlike attorneys who bill by the hour, class action attorneys are not paid until they receive a fee award from a court. *Id.* ¶ 24. Making class action attorneys wait to seek fees increases the cost of litigation and deters lawyers from bringing important cases. *Id.*

It is common for antitrust class actions to settle at multiple stages over time. In these cases, it is routine for courts to aggregate attorney fee requests. *See, e.g.*, *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2020 WL 5653257, at *3 n.5 (E.D. Mich. Sep. 23, 2020) ("In calculating the lodestar for purposes of the cross-check, it would be impractical to compartmentalize and isolate the work that EPP Class Counsel did in any particular case at any particular time because all of their work assisted in achieving all of the settlements and has provided and will continue to provide a significant benefit to all of the EPP classes."); *In re Capacitors Antitrust Litig.*, No. 3:14-CV-03264-JD, 2018 WL 4790575, at *6 (N.D. Cal. Sept. 21, 2018) ("Because the total work performed by counsel from inception of the case makes each settlement possible, courts typically base fee

awards in subsequent settlements on all work performed in the case."); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2:10-md-02179-CJB-DPC (E.D. La. Feb. 15, 2017), Dkt. 22252 at 47 ("Viewing the BP Settlements together with the HESI and Transocean Settlements is . . . more relevant when the Court is conducting its lodestar cross-check."); *In re Se. Milk Antitrust Litig.*, No. 2:07-CV 208, 2013 WL 2155387, at *4 (E.D. Tenn. May 17, 2013) (aggregating two fee awards over time and dividing by the litigation's total lodestar to perform lodestar crosscheck); *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 124 (D.N.J. 2012) (aggregating four fee awards over time and dividing by the litigation's total lodestar to perform lodestar crosscheck); *Payne*, 2012 WL 13006270, at *3 ("[I]t is apparent that the Maryland fee-and-expense request is amply supported by a lodestar crosscheck based on the time and expense incurred, and fees available, in resolution of all the state-by-state settlements of the fiber-optic-cable right-of-way litigation.").

Thus, should the Court decide to apply the lodestar crosscheck, it should add the fee award in the *Seaman* settlement ($18.16 million) with the fee request here ($4.75 million), and divide them into the total lodestar Class Counsel has spent on this litigation since it began in 2015 ($6,835,134).  This shows that granting the new fee request would move class counsel's multiplier only from 2.86 to 3.35, still well within a reasonable range.  *See Phillips*, 2016 WL 2636289, at *8 ("Courts have found that lodestar multipliers ranging from 2 to 4.5 demonstrate the reasonableness of a requested percentage fee."); *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 689 (D. Md.

2013) (noting that the lodestar multipliers "on large and complicated class actions have ranged from at least 2.26 to 4.5").

### B. Class Counsels' Expenses are Reasonable and Appropriate

Class Counsel's reimbursable expenses in *Binotti* total $125,201.41. Harvey Decl. ¶ 12. The largest expense, $118,082.16, relates to Dr. Binotti's expert consultants. *Id*. ¶ 13. The amount is reasonable in light of the critical role expert economic analysis plays in class action antitrust litigation, where experts establish classwide impact and measure damages. Here, Dr. Binotti hired economists to create a regression model to estimate damages, helping Dr. Binotti to engage in informed settlement negotiations, and laying the groundwork to meet her burden at class certification and trial. *Id*.

### C. Dr. Binotti Has Earned, And Public Policy Supports, The Requested Service Award

Service awards "are intended to compensate class representatives for work done on behalf of the Class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Berry*, 807 F.3d at 613 (citation omitted). Such awards are "common . . . in recognition of the time and effort [class representatives] have invested for the benefit of the class." *Temp. Servs., Inc.*, 2012 WL 13008138, at *6. Service awards are particularly appropriate in antitrust class actions, where named plaintiffs take substantial risks to vindicate fundamental public policies.

Dr. Binotti dedicated over 70 hours to securing a $19 million cash benefit for the Class. Binotti Decl. ¶ 8; Harvey Decl. ¶ 24. She assisted with litigation strategy,

discovery, and settlement negotiations, and attended the December settlement conference and the hearing on the motion to direct notice to the class. Binotti Decl. ¶ 8.

Most importantly, Dr. Binotti risked her reputation and workplace retaliation by serving as a named plaintiff in this high-profile case. Her relationships with other UNC professors have been impacted. Binotti Decl. ¶ 10. At national meetings, others are aware of her role in this case. *Id.* Future employers in academia may view her as a troublemaker. *Id.* Dr. Binotti's exposure and the risk of retaliation strongly favor an adequate service award. *See*, *e.g.*, *Seaman*, 2019 WL 4674758, at *7 (awarding $125,000 to named plaintiff who "put her professional career on the line when she came forward"); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *17 (N.D. Cal. Sept. 2, 2015) (approving $100,000 service awards where named plaintiffs received considerable media coverage and were likely to be viewed as "troublemakers" by future employers).[4]

Though the Class includes thousands of other faculty, no others stepped forward to risk their personal reputation or jobs for the Class. That is another factor favoring the

---

[4] *See also Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 201 (S.D.N.Y. 1997) (recognizing that in an employment case, "the plaintiff is frequently a present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril"); Nantiya Ruan, *Bringing Sense to Incentives: An Examination of Incentive Payments to Named Plaintiffs in Employment Discrimination Class Actions*, 10 Emp. Rts. & Emp. Pol'y J. 395, 396-397 (2006) (in addition to case-related responsibilities, "[e]mployees, former and current, take huge risks when they agree to be named plaintiffs in a class action bringing legal claims of unlawful bad acts by employers. Retaliation, isolation, ostracism by co-workers, 'black listing' by future employers, emotional trauma, and fear of having to pay defendants' legal fees are among the most obvious").

requested service award, as Dr. Binotti was the only Class Member willing to perform the "public service of contributing to the enforcement of mandatory laws." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (en banc), *cert. denied,* 132 S. Ct. 1876 (2012) (citation omitted). Without Dr. Binotti's initiative, it is likely the violation at issue never would have been remedied. *Cf. Seaman*, 2019 WL 4674758, at *7*; In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 563 (N.D. Cal. 2013) (observing that the "Supreme Court has long recognized that class actions serve a valuable role in the enforcement of antitrust laws").

Finally, the 20:1 ratio between Dr. Binotti's award ($65,000) and the average class member recovery ($3,207 for regular rank faculty) is reasonable and similar to amounts regularly approved by other courts. *See In re High-Tech*, 2015 WL 5158730, at *18 ($100,000 service awards 14-21 times greater than average class member recovery); *Titanium Dioxide*, 2013 WL 6577029, at *1 ($125,000 service award); *Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194(CM), 2010 WL 4877852, at *4, *8, *28 (S.D.N.Y. Nov. 30, 2010) ($125,000 service award in $175 million settlement); *Marchbanks Truck Serv. v. Comdata Network, Inc.*, No. 07-CV-1078 (E.D. Pa. July 14, 2014), Dkt. 713 at 8 ($150,000 service award); *Ivax Corp. v. Aztec Peroxides, LLC, et al.*, No. 02-CV-00593 (D.D.C. Aug. 24, 2005), Dkt. 78 at 2 ($100,000 service awards); *Sullivan*, 667 F.3d at 333 n.65 ($85,000 service awards); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) ($300,000 service award to each of four representative plaintiffs); *Beck, et al. v. Boeing Co.*, No. 00-CV-0301-MJP (W.D. Wash Oct. 8, 2004), Dkt. 1067 at 4

($100,000 service awards to each named plaintiff); *Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2011 WL 4478766, at \*12-13 (E.D. Okla. Aug. 16, 2011) ($100,000 service awards ), *report and recommendation adopted*, 2011 WL 4475291 (E.D. Okla. Sept. 26, 2011). This Court has recognized that a service award is appropriate where the "amount is consistent with awards in similar [antitrust] settlements . . . ." *Sims*, 2019 WL 1993519, at \*4 (Eagles, J.). The Court should approve the requested service award.

## V. <u>CONCLUSION</u>

For the above reasons, Dr. Binotti respectfully requests that the Court (1) award Class Counsel 25% of the common fund ($4,750,000) in attorney's fees; (2) reimburse Class Counsel's out-of-pocket litigation expenses ($125,201.41); and (3) approve a $65,000 service award to Dr. Binotti.

2240357.11

Dated:  July 12, 2021

Respectfully submitted,

*/s/ Dean M. Harvey*

Dean M. Harvey*
Anne B. Shaver*
Lin Y. Chan*
Yaman Salahi*
Jallé Dafa*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
dharvey@lchb.com
ashaver@lchb.com
lchan@lchb.com
ysalahi@lchb.com
jdafa@lchb.com
* appearing pursuant to LR83.1(d)

*/s/ M. Travis Payne*

M. Travis Payne
N.C. State Bar No. 8452
EDELSTEIN & PAYNE
315 East Jones Street
Raleigh, NC 27601
Telephone: (919) 828-1456
Facsimile: (919) 828-4689
eandp@mindspring.com

*/s/ Robert M. Elliot*

Robert M. Elliot
N.C. State Bar No. 7709
Daniel Lyon
N.C. State Bar No. 43828
ELLIOT MORGAN PARSONAGE, PLLC
426 Old Salem Rd.
Brickenstein-Leinbach House
Winston-Salem, NC 27101
Telephone: (336) 724-2828
Facsimile: (336) 724-3335
rmelliot@emplawfirm.com

*Counsel for Individual and Representative*
*Plaintiff Lucia Binotti*

## CERTIFICATE OF COMPLIANCE WITH CIVIL LOCAL RULE 7.3

I hereby certify that the BRIEF IN SUPPORT OF MOTION TO FILE UNDER

SEAL complies with Local Rule 7.3(d) and contains fewer than 6,250 words.

This the 12th day of July, 2021.

*/s/ Dean M. Harvey*
Dean M. Harvey

BRIEF ISO PLAINTIFFS' UNOPPOSED MOTION RE
ATTORNEY'S FEES
CASE NO. 1:20-CV-00470

2240357.11

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will automatically send notification

of the filing to all counsel of record.


/s/ Dean M. Harvey
Dean M. Harvey